**McCUSKER, ANSELMI, ROSEN & CARVELLI, PC.**
805 Third Avenue, 12th Floor
New York, NY 10022
212-308-0070

**Hearing date to be
determined by Court**

**LAW OFFICES OF WILLIAM S. KATCHEN, LLC**
210 Park Avenue, Suite 301
Florham Park, New Jersey 07932

*Counsel for Cumberland Farms, Inc. and Gulf Oil Limited Partnership*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| AIRPORT DEVELOPMENT CORP., | Case No.: 14-75683 (AST) |
| BRENTWOOD DEVELOPMENT CORP., | 14-75670 (AST) |
| ISLANDIA DEVELOPMENT CORP., | 14-75677 (AST) |
| ISLIP DEVELOPMENT CORP., | 14-75679 (AST) |
| MEDFORD DEVELOPMENT CORP., | 14-75666 (AST) |
| OCEANSIDE ENTERPRISES, INC., | 14-75678 (AST) |
| RONKONKOMA DEVELOPMENT CORP., | 14-75676 (AST) |
| SMITHTOWN DEVELOPMENT CORP., | 14-75669 (AST) |
| WESTBURY ENTERPRISES, INC., | 14-75680 (AST) |
| WHEELER DEVELOPMENT, LLC | 14-75668 (AST) |
| Debtors. | Hon. Alan S. Trust, U.S.B.J. |

**MOTION FOR ENTRY OF AN ORDER GRANTING RELIEF FROM THE
AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d), DECLARING
FRANCHISE AGREEMENTS TO BE TERMINATED PURSUANT TO 15 U.S.C. 2802,
DECLARING LEASES TO BE TERMINATED, AND GRANTING LEAVE TO
CUMBERLAND FARMS, INC. AND GULF OIL LIMITED PARTNERSHIP TO
PURSUE THEIR RIGHTS UNDER THE FRANCHISE AGREEMENTS AND LEASES**

TO:    The Hon. Alan S. Trust
          United States Bankruptcy Judge

Cumberland Farms, Inc. ("Cumberland") and its subsidiary, Gulf Oil Limited Partnership ("Gulf"),[1] though their attorneys, McCusker, Anselmi, Rosen & Carvelli, P.C. and the law offices of William S. Katchen, LLC, hereby submits this motion for the entry of an Order: 1) granting relief from the automatic stay to Cumberland pursuant to 11 U.S.C. § 362(d)(1); 2) declaring that the Franchise Agreements between Cumberland and Debtors are terminated pursuant to 15 U.S.C. § 2802 as a result of Debtors' prepetition material breaches thereof; 3) declaring that the Leases between Cumberland and Debtors are terminated as a result of Debtors' prepetition material breaches of the Leases and Franchise Agreements; and 4) granting Cumberland leave to pursue its rights under the Franchise Agreements and Leases. In support of the instant motion, Cumberland states as follows:

## INTRODUCTION

1.      As set forth in detail below, this matter arises from the relationship between Cumberland and Steven Keshtgar ("Keshtgar").

2.      Keshtgar is the principal shareholder of eighteen corporate entities that have entered into franchisee agreements ("Franchise Agreements") and property leases ("Leases") with Cumberland.

3.      Ten of the entities of which Keshtgar is the principal shareholder have filed for Chapter 11 reorganization (the "Debtors" or "Filing Entities") with this Court.

4.      For the reasons set forth herein, Cumberland respectfully requests the entry of an order granting Cumberland relief from the automatic stay, declaring the Franchise Agreements and

---

[1] While Cumberland and Gulf are distinct legal entities, they are acting in common in this matter. Accordingly, except in Paragraph 8, references to either entity are, for the purposes of this motion, intended to refer to both entities.

2

Leases between Cumberland and Debtors to be terminated as a result of Debtors' conduct, and granting Cumberland leave to pursue its rights under the Franchise Agreements and Leases between Cumberland and Debtors.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1334 and this matter is a core proceeding within 28 U.S.C. § 157(b)(2).

6.     Venue is proper pursuant to 28 U.S.C. §§ 1408-1409.

7.     The statutory bases for the relief requested by Cumberland are 11 U.S.C. §§ 362(d)(1) and 365(d)(2).

## FACTUAL BACKGROUND

8.     Cumberland has been franchising the Gulf trademark to branded motor fuel stations throughout the northeast for decades.  From 1986 through November 1993, the "Gulf" gasoline trademark was licensed by Gulf's parent company, Cumberland, through an exclusive License Agreement with Chevron USA, Inc. ("Chevron"), which provided that Cumberland receive rights to the Gulf trademark for certain geographic areas.  That license was assigned to Gulf in November 1993, at which time Gulf held and exercised all such rights on its own behalf.  In January 2010, Cumberland purchased outright and obtained all right, title, and interest in and to the Gulf trademark for the entire United States from Chevron, and, approximately six months later, Cumberland conveyed that ownership to Gulf.  At all relevant times, Gulf licensed or sub-licensed use of the Gulf trademark by gasoline distributors and retail motor fuel outlets through branding agreements such as the Franchise Agreements with the Debtors.  Declaration of Kevin Cummins ("Cummins Decl."), par. 2.

9.     In or about February, 2010, Cumberland purchased the rights to own and operate numerous Mobil-branded stations from Exxon Mobil Corporation ("ExxonMobil") throughout Nassau and Suffolk Counties, New York, and is specifically permitted under its license with ExxonMobil to sublease ExxonMobil's trademark rights to Gulf's tenants and/or sub-franchisors, subject to certain terms, which includes Gulf's responsibility (and sub-franchisor's responsibility under its agreements with Gulf) to maintain the integrity of the Mobil Trade Mark. Id. at par. 3.

10.     Gulf, like many franchisors, has established what it calls "Assured Dealers" in which the retail motor fuel dealer:  (a) leases the real estate from Gulf; and (b) is Gulf's motor fuel franchisee under the Gulf trademark or Mobil trademark, wherein the franchisee purchases branded petroleum products from Gulf. Id. at par. 4.

11.     Steven Keshtgar ("Keshtgar") is the principal shareholder of eighteen (18) separate corporate entities that have been Assured Dealers for Gulf-branded and Mobil-branded stations with locations throughout Queens, Nassau and Suffolk Counties in New York, for several years, beginning in or about 2003, when Gulf acquired Exxon-branded locations on Long Island and New York City, some of which were operated by Keshtgar for some time prior.  Over time, the Exxon-branded locations were re-branded under the Gulf trademark.  As of this writing, 10 of Keshtgar's 18 franchises with Gulf have filed for Chapter 11 reorganization (the "Filing Entities") with this Court (filing December 24, 2014), including:

> WHEELER DEVELOPMENT (HAUPPAUGE) (Mobil)
> AIRPORT DEVELOPMENT CORP. (JAMAICA) (Gulf)
> BRENTWOOD DEVELOPMENT CO. (BRENTWOOD) (Mobil)
> ISLANDIA DEVELOPMENT CORP. (HAUPPAUGE) (Gulf)
> ISLIP DEVELOPMENT CORP. (ISLIP TERRACE) (Mobil)
> MEDFORD DEVELOPMENT CORP. (MEDFORD) (Gulf)
> OCEANSIDE ENTERPRISES INC. (OCEANSIDE) (Gulf)
> RONKONKOMA DEVELOPMENT CO. (RONKONKOMA) (Gulf)
> SMITHTOWN DEVELOPMENT CO. (SMITHTOWN) (Mobil)
> WESTBURY ENTERPRISES INC. (WESTBURY) (Mobil)

Id. at par. 5.

12.     The Franchise Agreements between the Filing Entities and Gulf are subject to the jurisdiction of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§ 2801, *et seq.* (the "PMPA") as well as applicable state law.   The primary document included in the Franchise Agreements between Gulf and the Filing Entities (for both Gulf and Mobil-branded locations) is the Retail Motor Fuel Outlet Lease ("Lease").   The other contracts comprising the Franchise Agreements include a Dealer Contract of Sale, (which requires exclusive sales, as the case may be, of Gulf or Mobil branded gasolines and lubricating oils), certain personal guarantees and credit card agreements.   Id. at par. 6; Sample Lease, Exhibit A to Cummins Decl.

13.     The Leases all set forth a set of standards and obligations which must be met by the Assured Dealer, including:

- That all Federal, State and local environmental regulations be strictly followed (Par. 4 (e), (f), (j), (n)– General Covenants)
- That the business be open a minimum number of hours (Par. 6 – "Preserving Value of Premises")
- Not engaging or permitting any improper act or conduct on the premises detrimental to lessee, lessor or any member of the public (Par. 6)
- Responding expeditiously to all customer complaints (Par. 6)
- The Lease may be non-renewed or terminated for failure to comply with any provision of the lease, which provision is both reasonable and of material significance to the relationship created by the Lease. (Par. 11 (a))
- The Lease may be non-renewed or terminated for failure of Lessee to exert good faith efforts to carry out the provisions of the lease. (Par.11(b)) (these and the reasons below are also permissible reasons for termination under the PMPA)
- Occurrence of an event which is relevant to the franchise relationship under the lease, as a result of which the lease is subject to termination and non-renewal including: (1) Fraud or criminal misconduct by Lessee relevant to the operation of the premises; (2) Declaration of bankruptcy or judicial determination of insolvency of the Lessee; (8) Failure of Lessee to pay Lessor in a timely manner when due rent and other sums to which Lessor is legally entitled; (9) Failure to operate the premises for seven (7) consecutive days or such lesser period under which the facts and circumstances constitutes an unreasonable period of time;

(11) Knowing failure of Lessee to comply with Federal, State or local laws or regulation relevant to the operation of the premises. All of the occurrences on this list are set forth as permissible reasons under the PMPA (Other Events Permitting a Termination). Par. 11(c)

Cummins decl., par. 7.

14.    Gulf has long been aware of a steady and dramatic decline in sales volumes for gasoline products at the Filing Entities, some as high as a 75% drop since their peak in 2007. While each station has its own accounts and charges are made individually for sales of products against those purportedly independently-operated stations, at all times the Filing Entities operated as a single entity with respect to their overall debt obligation to Gulf. The debt for these Filing Entities and the other station franchises operated by Keshtgar became so pronounced by early 2014 that in March 2014, Gulf agreed to restructure Keshtgar's arrearages into Promissory Notes that included bulk monetary payments to be made to Gulf, along with the normal upcharges on each subsequent gallon of gasoline purchased. Id. at par. 8.

15.    As of January 5, 2015, the total net amount of the Promissory Notes was $1,316,851.83. Pursuant to the terms of the Promissory Notes, the 10 Filing Entities (as well as six other of Keshtgar's Assured Dealerships) are jointly and severally liable to Gulf for the total net amount. Id. at par. 9.

16.    In mid-December 2014, several Electronic Fund Transfers ("EFTs") authorized in writing by Keshtgar for rent and payment for petroleum purchases were presented by Gulf to Keshtgar's bank, but were rejected because of insufficient funds. On December 15, 2014, an authorized EFT consisting of eight drafts totaling $107,998.37 was presented to Keshtgar's bank. Gulf received a notice from the bank on December 17, 2014 stating that this EFT was rejected for "insufficient funds." On December 16th an authorized EFT consisting of four drafts totaling $128,937.41 was presented to Keshtgar's bank. Gulf received a notice from the bank on December 18, 2014 stating that this EFT was rejected and noting, "account frozen." On December 17th an

6

authorized EFT consisting of five drafts totaling $124,064.98 was presented to Keshtgar's bank. Gulf received a notice from the bank on December 19, 2014 stating that this EFT was rejected and noting, "account frozen." While Keshtgar promised that $236,935.78 would be wired to Gulf on December 18, 2014 to replace two of the EFTs, the monies were never received. On December 23, 2014, another authorized EFT consisting of sixteen drafts totaling $406,450.68 was presented to Keshtgar's bank. Gulf received a notice from the bank on December 23, 2014 stating that this EFT was rejected and noting, "account frozen." Keshtgar then advised Gulf he was financially incapable of bringing his account current. Id. at par. 10; EFT authorization documents, Exhibit B to Cummins Decl.

17.    Gulf learned that at least part of the reason for the dishonored EFTs was that Keshtgar's primary bank and secured lender, New York Commercial Bank, had swept $1.4 million from Keshtgar's accounts due to Keshtgar's deteriorating financial condition. Cummins Decl., par. 11.

18.    Throughout this period, Keshtgar repeatedly promised Gulf representatives that he would make imminent payment of a substantial portion of the rejected EFTs and wires but failed to do so. Id. at par. 12.

19.    Upon information and belief, Keshtgar was specifically directed by New York Commercial Bank not to overdraw his accounts. However, despite this directive and without disclosing either his imminent default or the bank's right to exercise cash flow sweeps, Keshtgar knowingly overdrew his accounts by authorizing the EFTs to Cumberland. Id. at par. 13.

20.    In a letter dated December 23, 2014, but hand-delivered and received on December 24, 2014, Gulf sent Keshtgar separate letters (the "Termination Notices") addressed to all 18 of his Assured Dealerships (including the 10 Filing Entities) pursuant to the PMPA and applicable

state law providing Notice of Franchise Termination with the required 10 day Notice to Cure. Id. at par. 14; Letters, Exhibit C to Cummins Decl.

21.    The Termination Notices each state that the reason for the franchise termination was

- Failure to comply with a reasonable Franchise provision which is of material significance to the franchise relationship/substantive requirement – the portion of the Lease wherein Dealer agreed to "pay [Gulf] for the above premises during the term of this Lease rent … to be paid to [Gulf] by [Dealer], in advance, on or before the first day of the month for which said rental is due" (citing the Lease at Par. 3); and,

- Failure to exert good faith efforts to carry out the provisions of the Franchise; and,

- The occurrence of an event which is relevant to the Franchise relationship and as a result of which termination of the Franchise is reasonable – failure by the dealer to pay to the Franchise in a timely manner when due all sums to which Gulf is legally entitled

Cummins Decl., par. 15.

22.    Because Keshtgar's dire financial circumstances made it unreasonable for Gulf to have to provide 90 days' notice, the letters provided 30 days' notice and 10 days to cure the violations, as permitted by the PMPA and applicable state law. On December 24, 2014, the day the Termination Notices were hand-delivered and received, Keshtgar's Filing Entities then filed for Chapter 11 protection. Id. at par. 16.

23.    As of January 5, 2015, the Filing Entities were indebted to Gulf in the amount of $2,252,166.22, but this sum is subject to increase depending on whether, and to what extent, Gulf subsequently receives further charges for products, credit-card chargebacks, taxes, utilities, etc. Id. at par. 17; summary of Filing Entities' indebtedness Exhibit D to Cummins Decl.

24.    The 10 Filing Entities (as well as the eight remaining of Keshtgar's Assured Dealerships) have been "dark," and the gasoline pumps have been closed, many of them covered, since at least the filing of the Petition on December 24, 2014 due to a lack of sufficient operating

8

capital, although it appears some of the convenience stores associated with these locations continue to operate.  Cummins Decl., par. 18; Photos, Exhibit D to Cummins Decl.

25.    Among other regulations imposed by Federal, State and local regulators governing gasoline service stations, the New York State Department of Environmental Conservation (NYDEC) regulations require, pursuant to Environmental Conservation Law ("ECL"), §§17-0303[3]; 17-1001, *et seq*. Part 613, certain mandatory reporting requirements pursuant to its state mandate to protect human health and the environment and to require service stations storing petroleum products to strictly monitor underground storage tanks ("USTs") to insure there are no leaks of product to the environment.  These regulations apply to all service stations with USTs in New York State, for example:

> **§613.4 Inventory monitoring for underground storage facilities**
> **(a) Inventory records**
> (1) The operator of an underground storage tank must keep daily inventory records for the purpose of detecting leaks. Records must be kept for each tank (or battery of tanks if they are interconnected) and shall include measurements of bottom water levels, sales, use, deliveries, inventory on hand and losses or gains. Reconciliation of records must be kept current, must account for all variables which could affect an apparent loss or gain and must be in accordance with generally accepted practices.
> **§613.9 Closure of out-of-service tanks**
> **(a) Closure of tanks temporarily out-of-service**
> (1) Storage tanks or facilities which are temporarily out-of-service for thirty (30) or more days must be closed as follows:
> (i) All products must be removed from the tank and piping system to the lowest draw-off point. Any waste product removed from the tank must be disposed of in accordance with all applicable state and federal requirements. Tanks must be protected from floatation in accordance with good engineering practices.
> (ii) All manways must be locked or bolted securely and fill lines, gauge openings or pump lines must be capped or plugged to prevent unauthorized use or tampering.
> (2) Storage tanks or facilities which are temporarily out-of-service are subject to all requirements of this Part and Part 612 of this Title including, but not limited to, periodic tightness testing, inspection, registration and reporting requirements.

Cummins Decl., par. 19.

26.    As of January 2, 2015, every one of the Filing Entities had been out of compliance with the monitoring requirement of 613.4 above for as many as 52 days (Islandia and Airport) or 42 days (Oceanside and Ronkonkoma) or 22 days (Wheeler and Smithtown) or at least 12 days (Westbury, Brentwood, Islip, and Medford).    Cummins Decl., par. 20; Chart, Exhibit F to Cummins Decl.

27.    On January 2, 2015, at the insistence of Gulf through its counsel, Keshtgar's operatives purported to electronically measure all of the USTs at the Filing Entities, some for the first time in nearly two months. Cummins Decl., par. 21.

28.    Pursuant to the terms of its Agreements with Gulf and NYDEC regulations, Keshtgar has a continuing obligation to perform ten (10) day inventory reconciliation on all USTs at his stations.  Id. at par. 22.

29.    This obligation is a continuing obligation whether or not the station is receiving or selling petroleum and requires the dealer to measure each UST every day to determine the amount of petroleum in each tank.  Id. at par. 23.

30.    Keshtgar is also required to record the number of gallons of petroleum in each UST every day, as well as the amount of petroleum delivered and sold with respect to each UST.  Id. at par. 24.

31.    Finally Keshtgar is required to perform a reconciliation of these amounts to determine whether any variance in a UST's volume is in compliance with New York State regulations.  Id. at par. 25.

32.    If during any ten (10) day period any UST does not meet New York State reconciliation requirements, certain reporting requirements are triggered.  Id. at par. 26.

33.    Pursuant to its Franchise Agreements, Gulf has the right to enter on to each Keshtgar location to review dealer inventory records to confirm Keshtgar is meeting its obligations pursuant to its agreements with Gulf and New York State regulations. Id. at par. 27.

34.    Given the fact that the stations at issue are not presently being operated (or in any event to the best of Gulf's knowledge not selling petroleum), Gulf is unable to determine whether Keshtgar is performing any UST reconciliations at the station. The inventory reports were updated on January 3, 2015 and show that the stations are not selling petroleum products. Id. at par. 28.

35.    In any event, and pursuant to Section 362(a), without consent of the Debtors or an order of this Court, Gulf is unable to enter onto the Filing Entity premises to review any reconciliation records to determine whether any such records are being kept, and if they are, whether the variances in any reconciliations are within guidelines set by New York State regulations. The inventory reports provided by Keshtgar are uploaded to a Gulf web site that Gulf can view, but Gulf relies on Keshtgar to provide the underlying inputs. Id. at par. 29.

36.    The present situation at these stations have put Gulf in a situation where they are unable to determine, based on the dealer records, whether Keshtgar is complying with its obligations under its contracts with Gulf or New York State regulations. Id. at par. 30.

37.    Gulf is in the process of analyzing the readings provided by Keshtgar in order to determine the integrity of the tanks at each location, however, the lack of diligence on the part of the Filing Entities in daily monitoring the USTs pursuant to its statutory responsibilities not only creates uncertainty regarding the USTs' structural integrity that has the potential to lead to environmental contamination, but creates potential liability for Gulf in that NY law makes the owner equally liable for violations and environmental contamination. Id. at par. 31.

38.    The continued closure of the 10 Filing Entities, some located along major thoroughfares, has inconvenienced customers and left the definite impression that there is either a financial or environmental cloud over these stations, creates a brand disparagement that threatens irreparable injury to both Gulf's and Exxon Mobil's Trade Marks and customer goodwill, as well as to the public interest. Id. at par. 32.

39.    Moreover, because of Keshtgar's financial situation, upon information and belief, many of his employees are not being paid and many or most of the mechanics have left their positions, leaving some stations without adequate monitoring against vandalism and theft. Id. at par. 33.

40.    We are also unaware whether Keshtgar has maintained the insurance on his property as required by the Franchise Agreements. The Lease requires that the lessees obtain and maintain, at their own expense, insurance as defined in Exhibit C to the Lease and the accompanying Schedule 1. Lease, Exh. A, par. 8. Exhibit C and Schedule 1 require that the lessees obtain and maintain coverage for commercial general liability or garage liability, business automobile liability, environmental impairment liability, liquor (dram shop) liability, excess/umbrella liability, property insurance, workers' compensation, and employers' liability. Cummins Decl., par. 34; contract provisions, Exhibit G to Cummins Decl.

41.    Moreover, Keshtgar's stations, including the Filing Entities, have cyclically been the subject of consumer complaints for a nefarious practice of having almost a $1.00 per gallon differential between cash and credit retail prices. Keshtgar adopted this policy approximately 2½ years ago, although there were brief periods when this significant disparity did not occur. For the past several months, the difference between cash and credit prices has been $0.98 per gallon. Cummins Decl., par. 35.

12

42.    Gulf therefore asks this court for relief from the automatic stay provisions of the Bankruptcy Code so that it can complete its termination of the Franchise Agreements and Leases for the Filed Entities. In addition, as set forth above, the Debtors' current management has a lengthy history of committing what could be considered pervasive acts of consumer fraud and dishonesty, which, in addition to the closing of the stations and the failure to adequately follow environmental regulations, have significantly harmed Cumberland and Gulf's reputation and could, unless abated by this Court through the conversion of these cases to one under Chapter 7 and the appointment of a Trustee, cause irreparable injury to Cumberland and Gulf's and ExxonMobil's Trade Marks[2] and rights under the Franchise Agreement. Id. at par. 36.

43.    Despite Cumberland's best efforts to respond to the numerous breaches of the Franchise Agreements and Leases with the Debtors, including: 1) the voluntary restructuring in March 2014 of significant obligations for products sold and delivered and lease payment defaults, 2) non-performance of Debtors' promises to promptly correct the numerous acts of price deception outlined in written customer complaints received by Cumberland, and 3) Debtors' knowing failure to disclose their lenders' imminent declaration of default and exercise of cash flow sweeps, which caused the nonpayment of more than $600,000 in obligations to Cumberland and contradicted the promises of payment by Debtors in immediately available funds (upon which Cumberland relied in extending further credit), the conduct of Debtors threatens to irreparably harm the trademark rights of Cumberland and has produced significant distrust of Debtors by Cumberland. Id. at par. 37.

44.    Cumberland also faces the threat of irreparable injury in that the actions of Debtors, as outlined above, have exposed Cumberland to significant potential liability under New York

---

[2] Which Gulf is contractually obligated to protect. See par. 3, *supra.*

environmental law and regulations. Although Cumberland has urged Debtors to conduct required inventory reconciliations and to otherwise comply with their obligations under the applicable environmental laws and regulations, Cumberland is currently unable to ensure that Debtors and their agents and/or employees are in fact in compliance. Id. at par. 38.

45.    Accordingly, absent immediate relief from the automatic stay, Debtors' conduct threatens to cause irreparable injury to Cumberland in the form of environmental liability and damage to Cumberland's trademark rights. Id. at par. 39.


## ARGUMENT

### I.    THE AUTOMATIC STAY AND RELIEF THEREFROM

46.    Upon the commencement of case under the Bankruptcy Code, an automatic stay is imposed upon claims against the debtor or the property of the debtor's estate. See 11 U.S.C. § 362(a); S.E.C. v. Wyly, No. 10-CV-5760 SAS, 2014 WL 5569363, at *1 (S.D.N.Y. Nov. 3, 2014) (explaining that "the policy of this section is to grant relief to the debtor from creditors, and to prevent the dissipation of the debtor's assets").

47.    However, a party in interest may obtain relief from the automatic stay. A "court shall grant relief from the stay . . . , such as by terminating, annulling, modifying, or conditioning such stay – (1) for cause, including the lack of adequate protection of an interest in property of such party in interest. . ." 11 U.S.C. § 362(d).

48.    "'[C]ause' is a broad and flexible concept that must be determined on a case-by-case basis." In re MF Global Holdings Ltd., 469 B.R. 177, 191 (Bankr. S.D.N.Y. 2012) subsequently dismissed sub nom. Sapere Wealth Mgt. LLC v. MF Global Holdings Ltd., 566 F. App'x 81 (2d Cir. 2014). Additionally, "the 'decision of whether to lift the stay [is committed] to

the discretion of the bankruptcy judge.'" In re Sonnax Indus., Inc., 907 F.2d 1280, 1286 (2d Cir.

1990) (quoting Matter of Holtkamp, 669 F.2d 505, 507 (7th Cir. 1982)).

49.    The Court of Appeals for the Second Circuit has articulated twelve factors which

may guide the determination of whether cause exists under Section 362(d)(1):

> These are: (1) whether relief would result in a partial or complete resolution of the issues;
> (2) lack of any connection with or interference with the bankruptcy case; (3) whether the
> other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with
> the necessary expertise has been established to hear the cause of action; (5) whether the
> debtor's insurer has assumed full responsibility for defending it; (6) whether the action
> primarily involves third parties; (7) whether litigation in another forum would prejudice
> the interests of other creditors; (8) whether the judgment claim arising from the other action
> is subject to equitable subordination; (9) whether movant's success in the other proceeding
> would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy
> and the expeditious and economical resolution of litigation; (11) whether the parties are
> ready for trial in the other proceeding; and (12) impact of the stay on the parties and the
> balance of harms

Id. at 1286 (citing In re Curtis, 40 B.R. 799-800 (Bankr. D. Utah 1984)).

50.    For the reasons stated herein, cause exists under Section 362(d)(1) for relief from

the automatic stay.

## II.    BUT FOR THE AUTOMATIC STAY, CUMBERLAND IS ENTITLED TO A DECLARATION THAT ITS FRANCHISE AGREEMENTS WITH DEBTOR ARE TERMINATED PURSUANT TO THE PETROLEUM MARKETING PRACTICES ACT

51.    As noted above, Cumberland advised Debtors by letters dated December 23, 2014

that Debtors were in default of their obligations under the Franchise Agreements between

Cumberland and Debtors and that, as a result, Cumberland intended to pursue termination of the

Franchise Agreements as authorized by the PMPA.

52.    Debtors filed voluntary petitions in this matter on December 24, 2014. As a result,

the automatic stay provided for by Section 362 bars Cumberland from pursuing its rights against

Debtors under the Franchise Agreements and the PMPA.    See In re Deppe, 110 B.R. 898, 902

(Bankr. D. Minn. 1990).

53.    However, Cumberland is entitled to a declaration that its Franchise Agreements with Debtors are terminated under the PMPA as a result of Debtors' material breaches of the Franchise Agreements. Further, as set forth in detail below, Cumberland's sufficient grounds for termination constitute cause for granting relief from the automatic stay in this matter.

54.    As the Supreme Court has explained, "Petroleum refiners and distributors supply motor fuel to the public through service stations that often are operated by independent franchisees. In the typical franchise arrangement, the franchisor leases the service-station premises to the franchisee, grants the franchisee the right to use the franchisor's trademark, and agrees to sell motor fuel to the franchisee for resale." Mac's Shell Serv., Inc. v. Shell Oil Products Co. LLC, 559 U.S. 175, 178 (2010).

55.    The relationship between franchisors and franchisees is governed by the PMPA. The PMPA provides that a franchisor is entitled to terminate a franchisee agreement where the franchisee fails "to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship" or upon the "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." Id. at (b)(2)(A)-(B).

56.    The PMPA further provides that "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes, inter alia, "(2) declaration of bankruptcy or judicial determination of insolvency of the franchisee," "(8) failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled," "(9) failure by the franchisee to operate the marketing premises for (A) 7 consecutive days, or (B) such lesser period which under the facts and circumstances constitutes an unreasonable period of time,"

and "(11) knowing failure of the franchisee to comply with Federal, State, or local laws or regulations relevant to the operation of the marketing premises." Id. at (c).

57.    Here, the grounds for Cumberland's termination of the Franchise Agreements include: Debtors' substantial arrearages (totaling more than two million dollars as of the date of Cumberland's December 23, 2014 letter), repeated failure to repay the indebtedness in compliance with Confessed Judgment Promissory Notes executed by Debtors, failure to exert good faith to carry out the provisions of the Franchise Agreement -- including failure to operate the marketing premises and knowing failure to comply with environmental laws and regulations -- and failure to pay Cumberland all sums to which Cumberland is legally entitled.

58.    Specifically, Debtors accumulated substantial arrearages to Cumberland which, in March 2014, were collectively restructured into Promissory Notes between Keshtgar and Cumberland.

59.    In mid-December 2014, several Electronic Fund Transfers ("EFTs") authorized in writing by Keshtgar for rent and payment for petroleum purchases were presented by Gulf to Keshtgar's bank, but were rejected because of insufficient funds. On December 15, 2014, an authorized EFT consisting of eight drafts totaling $107,998.37 was presented to Keshtgar's bank. Gulf received a notice from the bank on December 17, 2014 stating that this EFT was rejected for "insufficient funds." On December 16th an authorized EFT consisting of four drafts totaling $128,937.41 was presented to Keshtgar's bank. Gulf received a notice from the bank on December 18, 2014 stating that this EFT was rejected and noting, "account frozen." On December 17th an authorized EFT consisting of five drafts totaling $124,064.98 was presented to Keshtgar's bank. Gulf received a notice from the bank on December 19, 2014 stating that this EFT was rejected and noting, "account frozen." While Keshtgar promised that $236,935.78 would be wired to Gulf on

17

December 18, 2014 to replace two of the EFTs, the monies were never received. On December 23, 2014, another authorized EFT consisting of sixteen drafts totaling $406,450.68 was presented to Keshtgar's bank. Gulf received a notice from the bank on December 23, 2014 stating that this EFT was rejected and noting, "account frozen." Keshtgar then advised Gulf he was financially incapable of bringing his account current.

60.     As of January 5, 2015, the total net amount of the Promissory Notes was $1,316,851.83. However, as noted above, this amount is subject to increase in accordance with further charges for products, credit-card chargebacks, taxes, utilities, etc. Pursuant to the terms of the Promissory Notes, the 10 Filing Entities (as well as six other of Keshtgar's Assured Dealerships) are jointly and severally liable to Gulf for the total net amount.

61.     Further, pursuant to Federal, State and local regulations, Debtors are required to comply with certain mandatory reporting requirements relating to the monitoring of USTs to insure there are no leaks of product to the environment. As described above, Debtors have failed to comply with NYDEC monitoring and reporting requirements. Debtors' noncompliance has persisted for as many as 52 days at some of the Filing Entity premises.

62.     Although, at the insistence of Cumberland, Keshtgar has agreed to resume monitoring of the USTs at the Filing Entity premises, Cumberland is unable to determine whether Keshtgar is in fact performing any UST reconciliations at the station and is unable to enter onto the Filing Entity premises to review any reconciliation records to determine whether any such records are being properly kept. The noncompliance and lack of diligence by Debtors' creates uncertainty regarding the risk of environmental contamination and potential liability for Cumberland.

63.    Additionally, Debtors have failed to operate the marketing premises. The 10 Filing Entities (as well as the remainder of Keshtgar's Assured Dealerships) have been "dark," and the gasoline pumps have been closed, many of them covered, since at least the filing of the Petition on December 24, 2014 due to a lack of sufficient operating capital, although it appears some of the convenience stores associated with these locations continue to operate.

64.    Moreover, because of Keshtgar's financial situation, upon information and belief, many of his employees are not being paid and many or most of the mechanics hired to work at maintain his service bays have left their positions, leaving some stations without adequate monitoring against vandalism and theft. It is also unknown whether Keshtgar has maintained the insurance on his property as required by the Franchise Agreements.

65.    The continued closure of the 10 Filing Entities, some located along major thoroughfares, has inconvenienced customers and left the definite impression that there is either a financial or environmental cloud over these stations, creates a brand disparagement that threatens irreparable injury to both Gulf's and Exxon Mobil's Trade Marks and customer goodwill, as well as to the public interest. Moreover, Keshtgar's stations, including the Filing Entities, have cyclically been the subject of consumer complaints for a nefarious practice of having almost a $1.00 per gallon differential between cash and credit sales.

66.    This conduct by Debtors causes irreparable harm to Cumberland's brand, its customer goodwill, and the value of its trademarks. Such irreparable damage has been held to constitute an incurable breach of a franchisee's obligations to the franchisor warranting immediate termination of the franchise agreement. Wisser Co. v. Mobil Oil Corp., 730 F.2d 54, 58-61 (2d Cir. 1984) (discussing franchisee's selling of misbranded gasoline and resultant harm to franchisor's "contract and property rights" as incurable breach warranting immediate termination).

67.     As set forth below, Debtors' material breaches of the Franchise Agreements, along with Cumberland's grounds for termination of the agreement arising therefrom, constitute "cause" for granting relief from the automatic stay pursuant to Section 362(d)(1).  In order to rectify, to the extent possible, the harms caused by Debtors' conduct, Cumberland must be permitted to take control of the operation of the Filing Entities and reclaim possession of the Filing Entity premises in their entirety.

68.     Further, the Franchise Agreements between Cumberland and Debtors were terminated as of Cumberland's December 23, 2014 termination notice, notwithstanding that the termination nominally was not to take effect until January 22, 2015.  "A franchisee that receives notice of termination 'has been terminated' within the meaning of § 2805(b)(2)(A)(i), even though the termination "takes effect" on a later date."  Mac's Shell, supra, 559 U.S. at 189.

69.     Even if the Franchise Agreements were not terminated immediately prepetition, they will be terminated automatically on January 22, 2015 as provided therein.  The operation of the automatic stay cannot prevent the termination of the Franchise Agreements on that date. "Section 362 does not give a debtor greater rights in a contract."  Moody v. Amoco Oil Co., 734 F.2d 1200, 1213 (7th Cir. 1984) ("Section 362, which creates an automatic stay of certain creditor actions upon the filing of a petition in the bankruptcy court, does not help debtors here. The automatic stay does not toll the mere running of time under a contract, and thus it does not prevent automatic termination of the contract"); In re Tudor Motor Lodge Associates, Ltd. P'ship, 102 B.R. 936, 948-49 (Bankr. D.N.J. 1989).

70.     Accordingly, Cumberland is entitled to a declaration that its Franchise Agreements with Debtors are terminated.

## III.    BUT FOR THE AUTOMATIC STAY, CUMBERLAND IS ENTITLED TO A DECLARATION THAT ITS LEASE AGREEMENTS WITH DEBTORS ARE

20

**TERMINATED PURSUANT TO THE PETROLEUM MARKETING PRACTICES ACT**

71.    Similarly, Cumberland is entitled to a declaration that its Leases with Debtors are terminated under the as a result of Debtors' conduct and material breaches of the Franchise Agreements. Further, as set forth in detail below, Cumberland's sufficient grounds for termination constitute cause for granting relief from the automatic stay in this matter.

72.    Cumberland's December 23, 2014 letter advising of the termination of the Franchise Agreements also advised Debtors that "all related agreements" (i.e., the Leases) were also terminated.

73.    Importantly, the arrearages identified in the December 23, 2014 letter included those for the nonpayment of rent as required by the Leases.

74.    As noted above, the Leases all set forth a set of standards and obligations which must be met by the Assured Dealer, including:

- That all Federal, State and local environmental regulations be strictly followed (Par. 4 (e), (f), (j), (n)– General Covenants)
- That the business be open a minimum number of hours (Par. 6 – "Preserving Value of Premises")
- Not engaging or permitting any improper act or conduct on the premises detrimental to lessee, lessor or any member of the public (Par. 6)
- Responding expeditiously to all customer complaints (Par. 6)
- The Lease may be non-renewed or terminated for failure to comply with any provision of the lease, which provision is both reasonable and of material significance to the relationship created by the Lease. (Par. 11 (a))
- The Lease may be non-renewed or terminated for failure of Lessee to exert good faith efforts to carry out the provisions of the lease. (Par.11(b)) (these and the reasons below are also permissible reasons for termination under the PMPA)
- Occurrence of an event which is relevant to the franchise relationship under the lease, as a result of which the lease is subject to termination and non-renewal including: (1) Fraud or criminal misconduct by Lessee relevant to the operation of the premises; (2) Declaration of bankruptcy or judicial determination of insolvency

21

of the Lessee; (8) Failure of Lessee to pay Lessor in a timely manner when due rent and other sums to which Lessor is legally entitled; (9) Failure to operate the premises for seven (7) consecutive days or such lesser period under which the facts and circumstances constitutes an unreasonable period of time; (11) Knowing failure of Lessee to comply with Federal, State or local laws or regulation relevant to the operation of the premises. All of the occurrences on this list are set forth as permissible reasons under the PMPA (Other Events Permitting a Termination). Par. 11(c)

75.     Debtors' failure to comply with environmental laws and regulations, failure to operate the Filing Entities, failing to respond to customer complaints, failure to pay all amounts due to Cumberland, and material breaches of the Franchise Agreements, as described above, therefore constitute grounds for termination of the Leases. See In re FPSDA I, LLC, 470 B.R. 257, 262 (E.D.N.Y. 2012) ("[W]here a nonresidential real property lease is part of an integrated arrangement consisting of another executory agreement, such as a franchise agreement, a debtor cannot assume the lease obligation without also curing the defaults under the related executory agreement").

76.     As noted above, In order to rectify, to the extent possible, the harms caused by Debtors' conduct, Cumberland must be permitted to take control of the operation of the Filing Entities and reclaim possession of the Filing Entity premises in their entirety.

77.     Accordingly, Cumberland is entitled to a declaration that its Leases with Debtors are terminated.

## IV.    DEBTORS' BREACHES OF THE FRANCHISE AGREEMENTS AND LEASES CONSTITUTE CAUSE FOR RELIEF FROM THE AUTOMATIC STAY

78.     Courts in many jurisdictions have repeatedly found that, where a creditor-franchisor possesses grounds under the PMPA to terminate a franchise agreement with a debtor-franchisee, such grounds for termination constitute cause for relief from the automatic stay under Section 362(d). See, e.g., In re Ramreddy, Inc., 440 B.R. 103, 116 (Bankr. E.D. Pa. 2009) (holding that failure of debtor-franchisee to demonstrate "that it has the financial wherewithal to assume

the lease under 11 U.S.C. § 365 . . . combined with the Debtor's ongoing post-petition default of its obligations under the Lease . . . constitute 'cause' under § 362(d)(1)"); Deppe, supra, 110 B.R. at 906 (accepting as correct franchisor's argument that "that the existence of nonremedial grounds for termination [under the PMPA], and the estate's resultant inability to assume the franchise agreements, give [the franchisor] 'cause' for a grant of relief from stay pursuant to 11 U.S.C. § 362(d)(1)"); In re Quinones Ruiz, 98 B.R. 636, 638 (Bankr. D.P.R. 1988) (determining that "commingling of fuel is regarded as a noncurable breach of a franchise relationship which constitutes cause for the lifting of the automatic stay to terminate the relationship"); Matter of Joyner, 55 B.R. 242, 245-46 (Bankr. M.D. Ga. 1985) (noting that it would "not [be] equitable for the Court to require [franchisor] to continue doing business with [debtor-franchisee]" in light of debtor-franchisee's breaches of jobber contract and granting relief from automatic stay to allow franchisor to pursue termination of contract under PMPA).

79.    Courts have also found violations of franchisee agreements in non-PMPA contexts to constitute cause for granting relief from the automatic stay. In In re B-K of Kansas, Inc., 69 B.R. 812 (Bankr. D. Kan. 1987), the debtor-franchisee failed to comply with a franchise agreement by failing to make required payments to the franchisor. The court explained that the debtor-franchisee could not provide adequate protection as it continued to use the franchisor's trade and service marks:

> The Court also grants relief from the stay "for cause, including the lack of adequate protection ..." 11 U.S.C. § 362(d)(1).
>
> First, [the franchisor] Corporation is not adequately protected in this case. The debtors have continued to use the trademarks and service marks without paying [the franchisor]. The arrearages on royalties and advertising are accumulating at an enormous rate. Furthermore, the property in this case, the use of trademarks and service marks, is of such a type that money may never adequately protect the movant. The movant's reputation to the general public is at stake.

23

. . .

> This Court is also concerned about the effect of the alleged post-petition arreages of the monies owed to [the franchisor] on the debtors' estate. In addition, many of the reasons espoused in the section 362(d)(2) discussion can be considered cause. For example, there is little chance of an effective reorganization in the near future.

Id. at 815.

80.     Similarly, in Tudor Motor Lodge Associates, supra, 102 B.R. 936, the court observed that the debtor-franchisee breached its license agreement with the franchisor by failing to erect signage and complete construction projects as required by the agreement.  The court explained that

> these defaults constitute material breaches of the License Agreement. At a threshold level, these practices diminish the value of [the franchisor's] marks and entitlements, adversely impact patron identification with the system's standardized services and consistent quality, reflect negatively on [the franchisor's] other franchisees, and affects [the franchisor's] royalties from the debtor.

Id. at 957. The court granted the franchisor's request from the automatic stay in order to terminate the license agreement.  In granting this relief, the court quoted B-K of Kansas, supra, 69 B.R. at 815, noting that "[t]he movant's reputation to the general public is at stake."

81.     Here, Debtors' material breaches of the Franchise Agreements, as described above, have cause irreparable harm similar to the harms described in Tudor Motor Lodge Associates and B-K of Kansas.  Debtors' conduct and the resultant harm constitute "cause" for relief from the automatic stay.

82.     Accordingly, the Court should enter an order granting Cumberland relief from the automatic stay and granting Cumberland leave to pursue its rights against Debtors under the Franchise Agreements and Leases.

**WHEREFORE**, for the foregoing reasons, Cumberland respectfully requests that the Court enter an Order: 1) granting relief from the automatic stay to Cumberland pursuant to 11 U.S.C. § 362(d)(1); 2) declaring that the Franchise Agreements between Cumberland and Debtors are terminated pursuant to 15 U.S.C. § 2802 as a result of Debtors' prepetition material breaches thereof; 3) declaring that the Leases between Cumberland and Debtors are terminated as a result of Debtors' prepetition material breaches of the Leases and Franchise Agreements; 4) granting Cumberland leave to pursue its rights under the Franchise Agreements and Leases; and 5) granting such other further relief as the Court deems equitable and appropriate.

Respectfully submitted,

McCUSKER, ANSELMI, ROSEN
& CARVELLI, P.C.
805 Third Avenue, 12th Floor
New York, New York, 10022
Telephone: (212) 308-0070
Facsimile: (917) 677-8978

LAW OFFICES OF WILLIAM S. KATCHEN, LLC
210 Park Avenue, Suite 301
Florham Park, New Jersey 07932

*Counsel for Cumberland Farms, Inc. and Gulf Oil Limited Partnership*

By: ____/s/ Bruce S. Rosen_____
                  Bruce S. Rosen

Dated: January 9, 2015