UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| Medford Development Corp. | Case No.: 8-14-75666 (AST) |
| Motor Parkway Enterprises Inc. | Case No.: 8-14-75667 (AST) |
| Airport Development Corp. | Case No.: 8-14-75683 (AST) |
| Wheeler Development LLC | Case No.: 8-14-75668 (AST) |
| Smithtown Development Corp. | Case No.: 8-14-75669 (AST) |
| Brentwood Development Corp. | Case No.: 8-14-75670 (AST) |
| Holbrook Development Corp. | Case No.: 8-14-75671 (AST) |
| Carman Development Corp. | Case No.: 8-14-75672 (AST) |
| Maple Avenue Hauppauge Dev. Corp. | Case No.: 8-14-75674 (AST) |
| Port Jefferson Development Corp. | Case No.: 8-14-75675 (AST) |
| Ronkonkoma Development Corp. | Case No.: 8-14-75676 (AST) |
| Islandia Development Corp. | Case No.: 8-14-75677 (AST) |
| Oceanside Enterprises Inc. | Case No.: 8-14-75678 (AST) |
| Islip Development Corp. | Case No.: 8-14-75679 (AST) |
| Westbury Enterprises Inc. | Case No.: 8-14-75680 (AST) |
| | |
| Debtors. | (Jointly Administered) |

------------------------------------------------------------------- X

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR ENTRY OF AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. §362(d), DECLARING FRANCHISE AGREEMENTS TO BE TERMINATED PURSUANT TO 15 U.S.C. §2802, DECLARING LEASES TO BE TERMINATED, AND GRANTING LEAVE TO CUMBERLAND FARMS, INC. AND GULF OIL LIMITED PARTNERSHIP TO PURSUE THEIR RIGHTS UNDER THE FRANCHISE AGREEMENTS AND LEASES AND GULF'S MOTION FOR ENTRY OF AN ORDER CONVERTING CASES UNDER CHAPTER ELEVEN TO CASES UNDER CHAPTER SEVEN PURSUANT TO 11 U.S.C. §1112(b)**

**Macco & Stern, LLP**
*Proposed Attorneys for the*
*Debtors and Debtors-In-Possession*
135 Pinelawn Road, Suite 120 South
Melville, NY 11747
(631) 549-7900

Medford Development Corp. and its affiliated entities (collectively, the "Debtors"),[1] the above-referenced debtors and debtors-in-possession, by and through their proposed counsel, Macco & Stern, LLP, submits this memorandum of law in opposition to Gulf Oil Limited Partnership and Cumberland Farms, Inc.'s (collectively, "Gulf") motion for entry of an order (1) granting relief from the automatic stay pursuant to 11 U.S.C. §362(d), (2) declaring Franchise Agreements to be Terminated pursuant to 15 U.S.C. §2802, (3) declaring Leases to be terminated, and (4) granting leave to Cumberland Farms, Inc. and Gulf Oil Limited Partnership to pursue their rights under the Franchise Agreements and Leases, dated January 9, 2015, and Gulf's motion to convert this case to one under Chapter 7, dated January 13, 2015, (collectively the "Motions"). The Motions and this opposition relate to the following entities (the "Gulf Debtors"): (1) Medford Development Corp.; (2) Oceanside Development Corp.; (3) Islip Development Corp.; (4) Islandia Development Corp.; (5) Smithtown Development Corp; (6) Westbury Enterprises, Inc.; (7) Ronkonkoma Development Corp; (8) Brentwood Development Corp.; and (9) Airport Development Corp.; and (10) Wheeler Development LLC

## BACKGROUND

On December 24, 2014 (the "Petition Date"), between 11:32 a.m. and 12:18 p.m. (the "Filing Time"), the Debtors filed fifteen (15) separate voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1] The Debtors, with associated case numbers, are as follows: (1) Medford Development Corp., 14-75666 (AST); (2) Motor Parkway Enterprises, Inc., 14-75667 (AST); (3) Airport Development Corp., 14-75683 (AST); (4) Wheeler Development LLC, 14-75668 (AST); (5) Smithtown Development Corp., 14-75669 (AST); (6) Brentwood Development Corp., 14-75670 (AST); (7) Holbrook Development Corp., 14-75671 (AST); (8) Carman Development Corp., 14-75672 (AST); (9) Maple Avenue Hauppauge Dev. Corp., 14-75674 (AST); (10) Port Jefferson Development Corp., 14-75675 (AST); (11) Ronkonkoma Development Corp., 14-75676 (AST); (12) Islandia Development Corp., 14-75676 (AST); (13) Oceanside Enterprises Corp., 14-75678 (AST); (14) Islip Development Corp., 14-75679 (AST); and (15) Westbury Enterprises Inc., 14-75680 (AST).

Prior to the Petition Date, the Debtors operated fifteen (15) separate gas stations, ten (10) of which were subject to franchise agreements (the "Franchise Agreements") and leases (the "Leases") with Gulf.  Both the Franchise Agreements and Leases were subject to the Title 28 of the United States Code, referred to as the Petroleum Marketing Practices Act (the "PMPA"), and relevant state law.

Immediately preceding the Petition Date, the Gulf Debtors were in default under their agreements with Gulf.  Subsequent to the filing of the petitions, the Gulf Debtors received Notices of Termination (the "Termination Notices"), from Gulf.

Immediately following the Filing Times on the Petition Date, the Gulf Debtors attempted to negotiate with New York Commercial Bank ("NYCB") and Gulf so that the Debtors could use NYCB's cash collateral as well as obtain debtor-in-possession financing from NYCB.  At all times during this negotiation period, Gulf made explicit statements to the Debtors in support of such reaching a deal with NYCB.  At no point during these negotiations did Gulf mention the Termination Notices.

After the Filing Times, the Debtors received the Termination Notices by (i) hand delivery, (ii) certified mail, and (iii) first class mail.  The Termination Notices stated three (3) grounds for the alleged termination of the Franchise Agreements and Leases: (1) a failure to comply with a reasonable Franchise Agreement provision which is of material significant, which was the failure of the Debtors to pay rent under the Lease on or before the first day of each month; (2) a failure to exert good faith efforts to comply with the provisions of the Franchise Agreements; and (3) the occurrence of an event which is relevant to the Franchise Agreements and as a result of which termination of the

Case 8-14-75666-ast   Doc 68   Filed 01/22/15   Entered 01/22/15 12:13:57


Franchise Agreement is reasonable, which is the failure of the Debtors to pay Gulf all sums due in a timely manner.

On January 13, 2015, the Debtors filed a motion pursuant to Bankruptcy Code §§363 and 365, whereby the Debtors sought to sell substantially all of the Gulf Debtors' assets in separate sales (the "Sale Motion").

<u>PRELIMINARY STATEMENT</u>

Debtors oppose Gulf's Motion on the grounds that: (1) the Franchise Agreements were Executory and the Leases were Unexpired within the meaning of Bankruptcy Code §365 as of the Petition Date and Filing Time; (2) Gulf is bound by the representations made to the Debtors after the Termination Notices were prepared; and (3) the Automatic Stay does not need to be lifted to allow Gulf to pursue their interests under the Franchise Agreements and Leases.

<u>ARGUMENT</u>

### I.  THE FRANCHISE AGREEMENTS WERE EXECUTORY AND THE LEASES WERE UNEXPIRED AS OF THE PETITION DATE

Bankruptcy Code §365(a) provides, in relevant part, that a "trustee [or debtor-in-possession], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."[2]

An "unexpired lease" is a lease which has not terminated prior to the Petition Date.  It is clear that the Leases had not expired prior to the filing of the petitions in these petitions.  Furthermore, although some of the Leases are "short-term" leases, they are customarily renewed, at the option of the franchisee under the PMPA.  The language of

---

[2] Bankruptcy Code §365(a).

the PMPA and the Leases themselves place restrictions of a franchisor's ability to nonrenew.

Although "executory contract" is not defined in the Bankruptcy Code, case law and secondary sources have established two competing theories for such determination: (1) the *Countryman* Test; and (2) the Functional Approach.    Under the *Countryman* Test, an executory contract is an agreement in which "the obligation of both the bankrupt and the other party are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."[3] Alternatively, under the Functional Approach, Courts have looked to whether the estate will benefit from the assumption or rejection of the contract, even where material obligations are remaining for only one of the two parties to the contract, if such assumption or rejection would ultimately benefit the debtor's estate and creditors.[4]

It is respectfully submitted that, under either approach, the Franchise Agreements were executory contracts and the Leases were unexpired leases as of the Petition Date.

   *(A)*    *Functional Approach*

Under the Functional Approach, the Franchise Agreements are executory and the Leases are unexpired regardless of Gulf's position on the Termination Notices.

It is undisputed that the Debtors had material obligations still outstanding as of the Petition Date.  Even though the Debtors have been in default, the Debtors were still entitled to cure such defaults as of the Petition Date.  The Termination Notices, if the Court ultimately deems them effective, still gave the Debtors thirty days before the

---

[3] V. Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1974).
[4] *See Shoppers World Cmty. Ctr., L.P. v. Bradlees Stores (In re Bradlees Stores, Inc.)*, 2001 U.S. Dist. LEXIS 14755 (S.D.N.Y. 2001) (quoting *Sipes v. Atlantic Gulf Communities Corp. (In re General Dev. Corp.)*, 84 F.3d 1364, 1374 (11th Cir. 1996).

Franchise Agreements terminated and an additional ten (10) day period to cure these defaults. Therefore, the Debtors still had an outstanding obligation sufficient to deem the Franchise Agreements executory and the Leases unexpired.

Moreover, the sale of substantially all of the Gulf Debtors' assets will net the Debtors' estates and creditors substantially more than if the Franchise Agreements were not deemed executory and the Leases were deemed expired. Substantially all of the Gulf Debtors' assets are made up of the Gulf Debtors' rights to operate the relevant gas stations and purchase petroleum from Gulf. If the Franchise Agreements and Leases are not deemed executory and unexpired, respectively, Gulf is entitled to a windfall, as they could then enter into new franchise agreements and leases with other entities. That sale would result in no distribution to the Debtors' creditors. The sale proposed in the Sale Motion, which would encourage bidding at a public auction, overseen by the Bankruptcy Court, has the opportunity to maximize the benefit to both Gulf and NYCB, the secured lender. Without the bankruptcy sale contemplated by the Sale Motion, the Debtors are left without a real chance to make a meaningful distribution to creditors.

Therefore, under the Functional Approach, the Franchise Agreements are executory and the Leases are unexpired.

### (B)    *Countryman Test*

Under the *Countryman* Test, provided there has not been a material breach that would relieve the non-breach contract party of its obligation to perform, the contract is executory. In this case, if the Debtors were entitled to cure their defaults as of the Petition Date, Gulf would not be relieved of performing their obligations under the Franchise Agreement and Lease. Accordingly, so long as the Debtors are entitled to cure their defaults, the Franchise Agreements are executory and the Leases are unexpired.

     (i)    <u>Neither the Franchise Agreements nor the Leases were Terminated as of the Petition Date and Filing Time</u>

Neither the Franchise Agreements nor the Leases had been terminated as of the Petition Date.  Since neither was terminated, the Franchise Agreements and Leases were still in full force and effective as of the Petition Date and can be assumed or rejected by the Debtors.

As stated in the affidavit of Steve Keshtgar (the "Keshtgar Affidavit"), dated January 22, 2015, the Debtors did not receive the Termination Notices until after the Petition Date and Filing Times.  Furthermore, the Termination Notices provided, in pertinent part, that the "Franchise [Agreement] and all related agreements with Gulf will terminate and be nonrenewed… provided, however, that Gulf hereby extends you a ten-day opportunity to cure".

Pursuant to Bankruptcy Code §362, as "a petition filed under section 301 [of the Bankruptcy Code] . . . operates as a stay, applicable to all entities, of – . . . (3) any act to obtain possession of property of the estate of property from the estate or to exercise control over property of the estate."[5]

The service of the Termination Notices by Gulf was in direct violation of the Automatic Stay pursuant to Bankruptcy Code §362.  The Second Circuit has determined that any act taken in violation of the Automatic Stay is void *ab initio*.[6]  Thus, the service of the Termination Notices after the Petition Date and Filing Times was void.

Accordingly, the Franchise Agreements were executory and the Leases were unexpired as of the Petition Date because the Termination Notices were not served before the Petition Date and Filing Times.

---

[5] Bankruptcy Code §362(a)(3).
[6] *See Rexnard Holdings Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994).

    (ii)   <u>The Franchise Agreements and Leases Could be Cured after the Petition Date</u>

Alternatively, if the Court determines that service of the Termination Notices pre-dated the Petition Date and Filing Times, the Debtors assert that, since the Petition Date was during to the Debtors' opportunities to cure the defaults, as stated in the Termination Notices, the Franchise Agreements and Leases remained executory as of the Petition Date.

Pursuant to the terms of the Termination Notices, the "Franchise [Agreement] and all related agreements with Gulf will terminate and be nonrenewed effective **January 22, 2015,** <u>provided, however, that Gulf hereby extends you a ten-day opportunity to cure</u> [emphasis in original]."   By its terms, Gulf made the representation that it "will terminate" the Franchise Agreement on January 22, 2015 (the "Termination Date").

The plain language of these Termination Notices says the Debtors may cure the defaults ten days after the Termination Date, on or before February 1, 2015 (the "Cure Period").   The Petition Date was prior to the commencement of the Cure Period and Termination Date.   Thus, the Debtors could have cured the defaults as of the Petition Date and may still cure such defaults.[7]

Pursuant to Section 108(b) of the Bankruptcy Code, if "…an agreement fixes a period within which the debtor… may… cure a default, …and such period has not expired before the date of filing the petition, the trustee may only …cure …before the later of the end of such period …or 60 days after the order for relief." 11 U.S.C. §108(b).

---

[7] In its motion, Gulf claims that the Debtors could cure the defaults within ten (10) days of the service of the Termination Notices.  This directly conflicts with the language of the Termination Notice.  By placing the cure period language after the Termination Date, the cure period directly modifies the Termination Date.  However, if the Court ultimately determines that Gulf's assertion is correct, the Debtors believe that, since the Petition Date was during the alleged cure period, the Franchise Agreements were still executory and the Leases were still unexpired as of the Petition Date.

Thus, the Debtors' right to cure is extended by operation of law at a minimum until sixty (60) days after the Petition Date.

By its terms, the Termination Notice granted the Debtors an opportunity the cure the defaults at any point before the expiration of the Cure Period. Thus, if the Debtors did not cure, Gulf would then terminate the Franchise Agreements. Section 108 of the Bankruptcy Code expands a debtor's time to cure a default. Furthermore, courts dealing with this issue have held that, where a debtor is provided a cure period, at the end of which the non-debtor contract party must commence the termination of such contract, that contract is executory and may be properly assumed or rejected by the debtors.[8] Courts have also determined this to apply to franchise agreements created under the PMPA, going so far as to state that under the PMPA, no cure period is required, so the granting of such period allows the debtor to cure, then assume and assign, even after a notice of termination is served.[9]

Other Courts have also interpreted the intersection of the PMPA and Bankruptcy Code to allow an assumption or rejection of a contract where the non-debtor party to contract served a notice of termination prior to the petition date, but the debtor filed for relief under the Bankruptcy Code during the cure period.[10] The Court in Moody stated

---

[8] *In re CW Mining,* 641 F.3d 1235 (10th Cir. 2011) (finding that where a debtor filed a chapter 11 petition during a sixty (60) day cure period, as contained in a notice of termination sent pre-petition, the debtor could properly assume or reject the contract as executory because the language of the notice of termination implied the non-debtor would need to take additional steps after the cure period to effect the termination).

[9] *In re Deppe,* 110 B.R. 898 (Bankr. D. Minn. 1990) (determining that the PMPA does not require a cure period, but the non-debtor contract party may grant it, during which the debtor may file a petition for relief under the Bankruptcy Code and assume or reject as executory, provided a cure payment is made, which the chapter 7 trustee failed to provide for).

[10] *See Moody v. Amoco Oil Company (In re Moody),* 734 F,2d 1200 (7th Cir. 1984) (finding that where the debtor filed for bankruptcy prior to the expiration of the cure period contained in the termination notice, the debtor could assume or reject the contracts executory, with some degree of flexibility); and *Shell Oil Company v. Anne Cara Oil Co., Inc. (In re Anne Cara Oil Co., Inc.),* 32 B.R. 643 (Bankr. D. Mass. 1983) (determining that where a franchisor sent the debtor a notice of termination and, on or before the effective

that "Section 365 specifically governs the time for curing defaults in executory contracts, and thus, it controls here… Under Section 365(a), debtors may still elect to assume the contract. If debtors ultimately determine to assume it, they may cure the default at any time prior to the assumption, pursuant to Section 365(b)(1)(A)." <u>Moody</u>, 734 F. 2d at 1215-16.

Gulf relies upon the decision in *Mac's Shell Service, Inc. v. Shell Oil Products Company LLC,* in stating that, under the PMPA, upon service of a notice of termination, the termination, albeit dated sometime in the future, is effective as of the service date.[11] However, Gulf's reliance is misplaced. First, the termination in the *Mac's* matter did not contain a notice to cure. Second, the holding in *Mac's* related to a franchisee seeking to avail itself of the protections contained in 28 U.S.C. §2805, an enforcement provision of the PMPA that grants franchisees injunctive relief. The Court deemed the contract terminated in order to allow the franchisee to protect itself under 28 U.S.C. §2805. Thus, the Court recognized that the PMPA was designed to protect franchisees. The holding in *Mac's Shell Service, Inc.* should not be expanded to allow franchisors to terminate contracts immediately despite granting a cure period. This would be in direct contravention to the reasoning of *Mac's Shell Service, Inc.*, and the PMPA, which both seek to protect franchisees from the franchisor, which is a large corporation with unlimited resources.[12]

---

date of termination, the debtor petition for relief under chapter 11 of the Bankruptcy Code, the contract was executory, so long as the debtor made some attempt to assume the contract).

[11] 559 U.S. 175 (2010) (finding that, in a non-bankruptcy proceeding, where the franchisor claims a service station is constructively abandoned and uses such grounds to issue notices of termination upon its franchisees, the court will deem the contracts terminated so the franchisee can avail itself of the protections contained in 28 U.S.C. §2805).

[12] *Id.*

Based on the foregoing, the Debtors may assume or reject the Franchise Agreements as executory and the Leases as unexpired. The Petition Date was prior to the service and receipt of the Termination Notices, prior to the Termination Date, and also prior to the end of the applicable Cure Period. Moreover, the Debtors have taken affirmative steps to assume and assign the Franchise Agreements, as shown by the filing of the Sale Motion. The Sale Motion also contains cure procedures, which will cure all defaults contained the Termination Notices contemporaneously with the assumption and assignment. Accordingly the Franchise Agreements are executory and the Leases are unexpired, and may be validly assumed and assigned pursuant to the terms of the Sale Motion.

> (iii) <u>The Franchise Agreements and Leases were not Properly Terminated under their Terms or the Conditions Contained in the PMPA</u>

The Termination Notices did not comply with the PMPA requirement that the franchisor grant the franchisee ninety (90) days notice of termination ("PMPA Notice Requirement").[13]

---

[13] 28 U.S.C. §2804 states, in relevant part:

> (a) Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship:
>> (1) in the manner described in subsection (c) of this section; and
>> (2) except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or nonrenewal takes effect.
>
> (b) (1) In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date of which termination or nonrenewal takes effect, as required by subsection (a)(2) of this section
>> A. such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable; . . .
>
> (c) Notification under this section:
>> (1) shall be in writing;

Pursuant to the PMPA Notice Requirement, unless such notice would not be reasonable, the non-debtor parties to a contract must give the debtors ninety (90) days notice.  In such cases where the PMPA Notice Requirement would not be reasonable, the non-debtor party to such contract must give the debtor the notice as of the earliest possible date.

Gulf provided the Debtors with a thirty (30) day notice in the Termination Notices.  This does not comply with PMPA §2804(b).  Additionally, although Gulf asserts that the PMPA Notice Requirement was not applicable because of it would not be reasonable to furnish such notice under PMPA §2804(b)(1)(A), Gulf failed to provide notice on the earliest date possible, which would have been immediately upon determining that the Debtors were in default.  Gulf's alternative argument in favor of shortened notice is the potential failure of the Debtors to comply environmental regulations.  However, at the time the Termination Notices were prepared, the Debtors were negotiating and expecting to continue operating, which Gulf was fully aware of. The Debtors had no expectation that the gas in its tanks would not begin pumping again until after negotiations stopped on January 7, 2015.  Despite the failure of the Gulf Debtors, the Gulf Debtors have continued to complete their obligation to report the environmental status daily.

Based on the foregoing, as of the date of the Termination Notices, ninety (90) days notice as required by the PMPA was still reasonable given the Debtors intention to

---

(2) shall be posted by certified mail or personally delivered to the franchisee; and
(3) shall contain:
    A. a statement of intention to terminate the franchise or not to renew the franchise relationship together with the reasons therefor;
    B. the date on which such termination or nonrenewal takes effect. . .
    C.

continue operating. Only after January 7, 2015 would Gulf have a valid reason to waive such notice, and therefore, cannot retroactively apply such reason to the date of the Termination Notices.

Since Gulf did not comply with the PMPA Notice Requirement, the Termination Notices should be deemed void and ineffective.

(iv) <u>The Termination Notices did not apply to the Leases</u>

Although the Termination Notice was an attempt to try and terminate the Franchise Agreement and "all related agreements," under the Real Property Actions and Proceedings Law, the Termination Notices are ineffective as to the Leases.

Pursuant to Article 7 of the RPAPL, the only way to terminate a commercial lease for nonpayment is the issuance of a warrant of eviction at the end of a summary proceeding.[14] The Termination Notices, without such warrant of eviction under Article 7 of the RPAPL, is wholly ineffective to terminate the Leases.

Moreover, Bankruptcy Courts have found that where a franchise relationship exists, the franchise agreement and related lease are inseparable documents.[15] This position has been adopted by various Courts, including those in the Eastern District of New York.[16]

Based on the foregoing, the Debtors assert that the Franchise Agreements and Leases were inter-related agreements and, as such, could not be separated. The

---

[14] *See* NY RPAPL §§701, *et seq.*
[15] *See In re Karfakis,* 162 B.R. 719 (Bankr. E.D. Pa. 1993) (finding that a purported termination of a franchise agreement was ineffective because the related lease agreement remained in force post-petition).
[16] *See In re FPSDA I, LLC,* 407 B.R. 257 (E.D.N.Y. 2012), *denying appeal of* 450 B.R. 392 (Bankr. E.D.N.Y. 2012) (Eisenberg, J.) (determining the Debtors time to assume or reject a lease ran until confirmation of the plan because it was inseparable from the inseparably related to a franchise agreement); *In re Caribbean Petroleum Corp.,* 444 B.R. 263 (Bankr. D. Del. 2010) (finding that a franchise agreement and lease agreement were so interrelated as to be inseparable); *In re 717 Grand St. Corp.,* 259 B.R. 1 (Bankr. E.D.N.Y. 2000) (Craig, J.).

13

Termination Notices did not comply with the provisions of Article 7 of the RPAPL and thus, since the Lease was not terminated, the underlying Franchise Agreement also could not be terminated.  As noted in the Sales Motion and the relevant Eastern District of New York case law, the Debtors are entitled to assume or reject the Franchise Agreements at any point until confirmation of the plan.  In the Sale Motion, the Debtors have requested that the deadline to assume or reject the Leases also be extended, as those two documents are inseparable agreements.

The Debtors assert that since the Termination Notice was ineffective as to the Lease and thus, neither the Franchise Agreement nor Leases were terminated.

## II.    GULF REPRESENTED TO THE DEBTORS' THAT THE TERMINATION NOTICES WOULD BE WAIVED IN ORDER TO SELL SUBSTANTIALLY ALL OF THE GULF DEBTORS' ASSETS

After the Petition Date, the Debtors and Gulf discussed (the "December 24 Conversation") the proposed sale of substantially all of the Gulf Debtors' assets (the "Sale").  Presumably, the December 24 Conversation took place after Gulf had drafted the Termination Notices since the Termination Notices were dated December 23, 2014, and after Gulf had sent the Termination Notices to be hand delivered.  In these conversations, Gulf stated that, due to the bankruptcy filing, it intended to support the proposed Sale and would push through the approval of the executed Sales Contracts.

Therefore, Gulf either (1) bound itself by the doctrine of equitable estoppel to the position asserted during the December 24 Conversation; or (2) waived its pre-Petition Date position, as stated in the Termination Notices, in the December 24 Conversation.

    (A)    _Equitable Estoppel_

Gulf is bound to maintain the position asserted in the December 24 Conversation because the Debtors changed their position based on the December 24 Conversation.

This Court, following New York law, has found that the doctrine of equitable estoppel has three elements for each party:

> (1) conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intent that such conduct (representation) will be acted upon; and (3) knowledge, actual or constructive, of the true facts . . . The elements pertaining to the party asserting estoppel are (1) lack of knowledge of the true facts; (2) good faith reliance; and (3) a change of position . . .[17]

Gulf has met its three requirements under the doctrine of equitable estoppel. Gulf conveyed to the Debtors that it would support the Sale and even assist in expediting its own approval of the Sale Contracts. Gulf made these statements during the December 24 Conversation and knew that the Debtors would act upon them in attempting to negotiate the use of cash collateral and a debtor-in-possession financing agreement with NYCB. Finally, Gulf was also aware that it previously sent Termination Notices to be hand-delivered and would improperly rely *Mac's Shell Service, Inc.* in an attempt to strong-arm both NYCB and the Debtors to consent to the termination of the Franchise Agreements and Leases.

The Debtors, the party asserting estoppel, can also meet the three elements that pertain to them. During the December 24 Conversation, Debtors were unaware that Gulf had attempted to terminate the Franchise Agreements and Leases because Gulf failed to disclose such termination and no Termination Notices had been received yet. The

---

[17] *In re Scotto,* 2010 WL 1688743 (Bankr. E.D.N.Y. Apr. 26, 2010) (*quoting Holm v. C.M.P. Sheet Metal Inc.,* 89 A.D.2d 229 (4th Dep't 1982)).

Debtors relied upon the statements contained in the December 24 Conversation and attempted to negotiate the use of cash-collateral and debtor-in-possession financing agreement with NYCB to help expedite the Sale.  Finally, this was a change in position from the Debtors' previous position that it needed to immediately reach a settlement agreement with Gulf before it entered into negotiations with NYCB as to cash collateral and debtor-in-possession financing.

Based on the foregoing, the Debtors assert that Gulf is bound by the doctrine of equitable estoppel to the representations made in the December 24 Conversation, particularly, that the Debtors' Franchise Agreements and Leases would not be terminated and Gulf would assist in the Sale.

### *(B)*     *Waiver of the Termination Notices*

Gulf waived its position pre-Petition Date position, as contained in the Termination Notices, by expressly stating that it was taking a different position during the December 24 Conversation.

On December 23, 2014, the date the Termination Notices were drafted, Gulf took the position that it intended to terminate the Franchise Agreements and the Leases.  On the morning of the Petition Date, prior to the Filing Times, Gulf prepared the Termination Notices to be hand-delivered in the afternoon.  During the December 24 Conversation, which was after the Filing Times, Gulf stated that it would help the Debtors in negotiating the use of cash-collateral and a debtor-in-possession financing agreement with NYCB.  This position was a valid waiver of Gulf's earlier position, that the Franchise Agreement and Leases should be terminated.  Accordingly, Gulf should be bound by such waiver.

Based on the foregoing, the Debtors believe that Gulf waived the position contained in the Termination Notices during the December 24 Conversation.

### III.    GULF IS NOT ENTITLED TO RELIEF FROM THE AUTOMATIC STAY

Based on the foregoing, Gulf should not be granted relief from the automatic stay to exercise its rights under the Franchise Agreements and Leases.  Since it is the Gulf Debtors' intentions to assume and assign the executory Contracts and unexpired Leases, and cure all defaults and provide adequate assumption of future performance, there is no need for relief from the Automatic Stay.  Any relief from the Automatic Stay would contradict the Debtor's rights under Section 365.

Moreover, Bankruptcy Code §362(d) states that, the Court shall "grant relief from the stay . . . (1) for cause, including lack of adequate protection."[18]  Where there is a lack of adequate protection, courts may order adequate protection under Bankruptcy Code §361.[19]

Gulf asserts that the Debtors alleged defaults under the Franchise Agreements and Leases is sufficient grounds to grant it relief from the automatic stay in order to pursue its rights, particularly, to terminate both the Franchise Agreements and the Leases.  In this

---

[18] Bankruptcy Code §362(d)(1).

[19] Bankruptcy Code §361 provides that:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
> (2)  providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

case, Gulf does not have a lien on the Debtors' assets.  Additionally, since the Gulf

Debtors are not operating, they cannot make periodic monthly payments to Gulf.

However, as indicated in the Sale Motion, the sale of substantially of the Gulf Debtors'

assets will net sufficient proceeds to cure all arrears under the Franchise Agreements and

Leases.  Without curing all defaults, the assumption and assignment of the Franchise

Agreements and Leases cannot be completed and the Sale will not be approved.  The

Debtors believe that, the right to receive 100% of all arrears and defaults

contemporaneously with the assumption and assignment of the Franchise Agreements is

the indubitable equivalent of Gulf's current interest in the Franchise Agreements and

Leases.  Accordingly, Gulf should not be granted relief from the automatic stay.

**CONCLUSION**

Based on the foregoing, the Debtors believe that (1) the Franchise Agreements

and Leases have not been terminated and may be assumed and assigned pursuant to the

Sales Motion; (2) Gulf is bound by its representations during the December 24

Conversation because those representation post-date the Termination Notices; and (3)

Gulf is not entitled to relief from the automatic stay.

Dated: Melville, New York
      January 22, 2015

**MACCO & STERN, LLP**
Proposed Attorneys for the
Debtors and Debtors-in-Possession

By:   /s/ Peter Corey
       Peter Corey, Esq.
       Cooper Macco, Esq.
       135 Pinelawn Road,
       Suite 120 South
       Melville, New York 11747
       (631) 549-7900